**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**JOANN M. PRICE**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF CHILD
SERVICES:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**DAVID DICKMEYER**
Certified Legal Intern

ATTORNEY FOR APPELLEE
LAKE COUNTY COURT APPOINTED
SPECIAL ADVOCATE:

**DONALD W. WRUCK**
Wruck Paupore PC
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
M.B., S.B., and C.B., Minor Children, )
                    )
      and              )
                    )
L.B., Mother, )
                    )
      Appellant-Respondent, )
                    )
         vs.            )    No. 45A03-1406-JT-193

|                                                    | )  |
| INDIANA DEPARTMENT OF CHILD                        | )  |
| SERVICES, and LAKE COUNTY COURT                    | )  |
| APPOINTED SPECIAL ADVOCATE,                        | )  |
|                                                    | )  |
| Appellees-Petitioners.                             | )  |

---

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Thomas P. Stefaniak, Jr., Judge
Cause Nos. 45D06-1309-JT-214, 45D06-1309-JT-215, 45D06-1309-JT-216

---

**December 23, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

L.B. ("Mother") appeals the involuntary termination of her parental rights to her children, M.B., S.B., and C.B. (collectively, the "Children"). Mother raises one issue, which we revise and restate as whether the evidence is sufficient to support the termination of her parental rights. We affirm.

FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of M.B., born October 10, 2006, S.B., born March 9, 2008, and C.B., born September 15, 2010.[1] Mother has abused drugs for most of her life and has a criminal history related to her drug usage, including convictions in 2003 for theft and forgery, convictions in 2004 for false informing and conversion, a conviction in 2005 for forgery, and a conviction in 2007 for false informing. The Indiana Department of Child

---

[1] She also has a fourth child who lives with his maternal grandmother, who serves as the child's legal guardian. The child began living with his maternal grandmother in 2004 when Mother became incarcerated. This child is not a party to this appeal.

Services ("DCS") has a history of interaction with Mother and the father of the Children ("Father").[2] In October 2007, Father was arrested in a drug house with M.B. in his arms. As a result, M.B. was placed in Mother's care. In May 2010, Mother became involved with DCS after an investigation revealed the presence of drugs, including opiates, cocaine, methadone, and benzoate, in her system. At the time, Mother was pregnant with C.B.

On June 1, 2010, DCS filed a petition alleging that M.B. and S.B. were children in need of services ("CHINS"), in which DCS alleged that Mother and Father smoked crack in the home while M.B. and S.B. were present; Mother worked as a prostitute at a truck stop; Mother, who at the time was participating in a methadone treatment program, admitted to using heroin and cocaine; and Mother was living in a motel room in Gary, Indiana, without functioning lights and very little food. On the same day, Mother admitted the material allegations contained in the CHINS petition. The court declared that M.B. and S.B. were CHINS and granted a temporary wardship to DCS.

On August 8, 2010 the court issued a dispositional decree, which incorporated the services recommended by the predispositional report, including a substance abuse evaluation, random drug screens, a parenting assessment and parenting classes, individual counseling, and supervised visitation. Mother's fourth child, C.B., was born on September 15, 2010, while M.B. and S.B. were cared for by their maternal grandmother. Mother and Father produced clean drug screens, which resulted in the

---

[2] The court also terminated the parental rights of Father, but he is not participating in this appeal. We therefore limit our recitation of the facts to those facts pertinent solely to Mother's appeal of the termination of her parental rights to the Children.

Children's reunification with Mother, and, on April 25, 2011, the court dismissed the wardship.

In July 2012, DCS investigated Mother after receiving a new report that Mother, who was still using methadone, had relapsed on cocaine and heroin. At the time of DCS's involvement, Mother was living at her grandmother's house. On July 27, 2012, the Children were removed from Mother's care and placed in foster care. On July 31, 2012, DCS again filed CHINS petitions alleging that Mother "uses crack and heroin, and gets paranoid while using drugs, and will use drugs in front of the children," that Mother "tested positive for cocaine and methadone," and that the Children "were removed because of the parent's drug use and the children's tender ages and placed in foster care." DCS Exhibit J at 2. The petition also alleged that the Children, at times, were out past midnight at truck stops and that Mother obtained crack from "driver's [sic] at the truckshop." Id. The petition alleged that M.B. expressed statements suggesting consideration of suicide and self-harm, of which Mother was unaware, was able to describe crack's appearance, and explained that the Children have witnessed Mother smoke crack. On the same day, Mother admitted to the material allegations in the petition, and the court declared the Children were CHINS.

On August 31, 2012, the court entered a dispositional decree, which incorporated the services recommended in the predispositional report[3] and required Mother's

---

[3] The predispositional report also noted that referrals to several counseling facilities, which provided drug and alcohol evaluations and treatment, family and group counseling, parenting assessment and parental counseling, individual counseling for M.B., and random drug screens for Mother, had been made on August 1, 2012 for Mother and the Children, but because Mother and the Children had scabies DCS services could not begin.

4

cooperation with all court-ordered services, compliance with the results of a substance abuse evaluation, recommendations of a parenting assessment and random drug screens, and participation in group counseling, home-based counseling, and supervised visitation.[4] The decree also required Mother to keep her appointments with service providers, remain in the county, and secure and maintain a stable source of income and housing. The services were recommended to ensure that Mother "refrain from using drugs" and that she "provide safe and stable housing" for the Children. DCS Exhibit S at 11. At the time of the dispositional decree, the Children's permanency plan was reunification.

On November 13, 2012, the court granted DCS's motion to suspend Mother's visitation and required Mother's participation in an inpatient drug program. A Review Hearing Order, dated December 19, 2012, required DCS to make a referral for Mother at an inpatient substance abuse program and Mother was given sixty days to enter an inpatient rehabilitation program. The Review Hearing Order adopted the statements in a DCS report, which noted that Mother had not availed herself of the services provided by DCS. Shavonne Smith, the Children's Family Case Manager at the time, ("FCM Smith") attempted to place Mother in an inpatient rehabilitation program. FCM Smith printed information and provided telephone numbers, Mother "wanted to go Haymarket" treatment center in Chicago, but FCM Smith "found out later that [Mother] had never" gone to inpatient rehabilitation. Transcript at 163. Mother never pursued treatment at Haymarket because she "let the drugs take over." Id. at 27.

---

[4] The dispositional decree made the Children wards of DCS as of July 31, 2012.

In March 2013, Mother moved to Pennsylvania but did not inform FCM Smith or anyone else of the move. After her visitation was stopped, DCS had minimal contact with her because Mother had gone to "Pennsylvania, to try to – just get away from the area more. This is the area, that people, places, and things change it." Id. at 25. A Review Hearing Order, dated April 1, 2013, modified the Children's permanency plan to termination of parental rights and adoption and discontinued all services to Mother. The Review Hearing Order adopted the statements in a DCS report, which observed that Mother was noncompliant with all court-ordered services, that DCS was unaware of Mother's whereabouts, that DCS was unable to contact Mother, and that DCS recommended adoption instead of reunification. Mother did not "get into in an inpatient [drug treatment program] as [she was] ordered." Id. at 168.

In the middle of June 2013, FCM Smith learned that Mother had moved to Pennsylvania. Mother informed FCM Smith that she had begun to participate in services at Rainbow Recovery, and FCM Smith sent a referral for an interstate compact placement on Children ("ICPC"). The ICPC was denied in November 2013 because no background clearance was ever completed for Mother, a Pennsylvania worker, after three unsuccessful attempts, was unable to contact her, and "because [Mother] got arrested." Id. at 28. From March 2013 through December 2013 Mother was in Pennsylvania, where she participated in, but did not complete, a methadone management program at Rainbow Recovery instead of inpatient rehabilitation as required by the December 19, 2012 Review Hearing Order. Ultimately, Mother did not complete either an inpatient or an outpatient treatment program to address her substance abuse issues.

6

On September 13, 2013, DCS filed its petition to terminate Mother's parental rights. Mother returned from Pennsylvania for the initial termination hearing on December 11, 2013, and there was an outstanding warrant for her arrest. She again returned to Indiana in January 2014 to attend to an outstanding warrant for a theft charge that occurred around 2011, and her family, at Mother's request, "called the bail bondsman and had him come get [her]." Id. at 71. As a result, Mother became incarcerated in the Porter County Jail on January 3, 2014 on a theft conviction, for which she was to be released from jail on June 27, 2014, followed by a year of probation. She also had a pending case for trespass. While incarcerated, Mother participated in a C.D.A. program at the Porter County Jail to continue her drug treatment.

On April 16, 2014, the court held an evidentiary hearing on DCS's termination petition. Mother was present at the hearing and testified to facts consistent with the foregoing. She testified that she was thirty-seven years old, had been using drugs since she was thirteen, began to use cocaine and heroin when she was twenty-five, and had undergone seven years of methadone treatment prior to December 2013, but, at the time of the hearing, she was "not on methadone." Id. at 13. Mother admitted that she was not compliant with the services required under the dispositional decree from July 2012 through December 2012. She indicated that she participated in the parenting assessment and the substance abuse evaluation, and understood that her drug use along with positive drug screens for cocaine and methadone, coupled with difficulty obtaining transportation, affected her ability to participate in supervised visitation. She also knew that her visitations were stopped on November 7, 2012 because of her positive drug screen. While

7

in Pennsylvania, Mother testified that she "stayed clean" and gained a significant amount of weight as a result of her sobriety. Id. at 27.

Regarding her housing situation, the Children's best interests, and plans following her release from the Porter County Jail, Mother stated that the last time she had lived in housing that was her own and not with family members was when she lived in New Chicago, which occurred sometime around the previous CHINS case that involved M.B. and S.B. Under questioning by an attorney for the Court Appointed Special Advocate ("CASA"), Mother stated that it had been "[a]bout two years" since she had last seen the Children. Id. at 44. She also testified that "stability" is the best thing for the Children but, regarding whether the Children's current placements provided stability, stated "I'm not going to comment on that." Id. at 45. Mother explained that after her release from jail, her plans for housing involved a friend "who has signed up to get me an apartment and he's basically going to have everything set up for me, because I have the probation going on and I cannot live at my grandmother's house" because her "uncle is on parole." Id. at 46. Mother acknowledged that, as of the hearing date, she did not have an apartment or a place to live but testified that "[b]efore June 27th" she would have a place to live. Id. She further acknowledged that, as of the hearing date, she had no source of income to pay for an apartment. When asked by the CASA attorney, "[d]o you not see why people would be concerned over that plan," Mother responded, "I totally understand." Id. at 74.

Naomi Knoerzer, clinical director at Crown Counseling, conducted a parenting assessment on Mother on October 19, 2012, and she testified to her impression of Mother as follows: "I was quite disturbed . . . because . . . she was sweating profusely" and "had to

8

stand by a window, eventually we got her a fan, she had to leave the meeting several times and use the restroom," and, at one point, Mother came "out and spray[ed] air freshener throughout out [sic] lobby, saying that someone had vomited, when there was no such event that had happened." Id. at 81-82. Knoerzer added that she "believe[d] that [Mother] was hallucinating off of what she was taking, or that she, herself had been ill and was trying to cover that up." Id. Regarding Mother's parenting assessment, Knoerzer explained:

> I was able to complete the majority of it, a few assessments she did not complete, but most of the inventories came back that she was considered very high risk for child abuse and neglect, due to have [sic] low levels of empathy endorsing corporal punishment, having difficulty understanding appropriate child development and reversing parent/child roles, indicating that she gets her emotional fulfillment through her children, rather than her providing emotional fulfillment.

Id.

FCM Stephens stated that the Children had been in foster care since July 27, 2012. She indicated that, at the time of the termination hearing, Mother was not in a better position to reunify with the Children and, in response to questioning about whether Mother had remedied the conditions resulting in removal, testified:

> I believe she is trying, but I do not think that they are remedied. You still have outstanding legal issues that are pending. Right now, due to her incarceration, she does not have access to illegal substances, but . . . I cannot say that [the conditions] are remedied. I don't have any documentation or proof that they have been remedied.

Id. at 115-116.

FCM Stephens explained that the Children have had "extensive mental health issues due to the traumatic experiences that they've had while in [Mother's] care." Id. at 116-117 She stated that M.B. has been "diagnosed with mood disorder, oppositional defiant disorder

9

. . . has been placed in Michiana behavioral health, [and] was on his way to a residential facility at age seven." Id. She also stated that S.B. had "huge boundary issues, doesn't know a stranger from a person that is close to [her]." Id. She further testified as to her belief that continuing the parent-child relationship posed a threat to the Children's well-being, and that following Mother's release from jail she would not consider placing the Children with Mother because Mother would need about a year or two of additional services, and because she lacked any reasonable certainty that Mother would not relapse.

Mary Edwards, a family consultant at Kidspeace, explained that C.B., has not "really been exposed to [Mother]" but "needs ongoing . . . services to make sure that [C.B.] has developed mentally" which includes speech therapy, and that C.B., in an angry outburst, threw a chair while at school. Id. at 182-183. Edwards stated her belief that termination of the parent-child relationship was in the Children's best interest. Edwards also testified that the Children "are doing so well currently, they've made [] tremendous progress. I'm very impressed with the progress that they've made." Id. at 181.

R.F., foster parent to M.B., stated that he is ready to adopt M.B. and that M.B. is "excited about staying with us and being a forever home." Id. at 188. K.R., the foster mother for S.B. and C.B., indicated that she was willing to adopt them if the court terminated the parent-child relationship, that S.B. and C.B. "need a stable place where they know what's going to happen, people who love them, and where they feel safe," and that she felt adoption into her home could provide a stable, loving environment for the two children. Id. at 192.

On April 17, 2014, the court issued an order terminating Mother's parental rights to her Children. The court's order stated in part that Mother was currently incarcerated on a theft charge, that Mother's family had a history with DCS dating back to 2007, and that Mother had a long history of substance abuse. The court further found that Mother lacked stable housing, income, and had failed to address her substance abuse issues. The order also found that because of Mother's incarceration she "does not have access to drugs" but "admitted Methodone [sic] use which is progress from her past lifestyle, but not complete sobriety." Appellant's Appendix at ii. Consequently, the court concluded that "[t]here is a reasonable probability the conditions resulting in removal . . . will not be remedied in that: The children became wards . . . due to [Mother's drug abuse]. [Mother has] a long history with substance abuse." Id. at i-ii. The court's order further concluded that Mother is unlikely "to ever be in a position to properly parent these children due to [Mother's] pattern and history of drug usage," and that Mother has not "completed services or addressed [her] drug usage." Id. at iv. The court also concluded that continuing the parent-child relationship posed a threat to the Children's well-being, stating that Mother's "recent strides to remain drug free are commendable, but there still remains [sic] many problems that [Mother] faces, namely; bonding issues with all three children, stability in housing, stability with financing, and no present ability to parent the children from jail," and that termination was in the Children's best interest. Id.

## DISCUSSION

The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment

11

contains specific findings of fact and conclusions thereon. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. In re E.M., 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. Id.

We note that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. See In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. The purpose of terminating parental rights is not to punish parents, but to protect their children. In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). To that end, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

12

>
> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)  that termination is in the best interests of the child; and
>
> (D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009), reh'g denied. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

A.    Remedy of Conditions

We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. See Ind. Code § 31-35-2-4(b)(2)(B)(i).

In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re N.Q., 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the

13

permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id. "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, 'but also those bases resulting in the continued placement outside the home.'" Id. (quoting In re A.I., 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), trans. denied). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Id. "The burden for DCS is to establish 'only that there is a reasonable probability that the parent's behavior will not change.'" Id. (quoting In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007)). A trial court may also properly consider the services offered to the parent by a local DCS office and the parent's response to those services as evidence of whether conditions will be remedied. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1252 (Ind. Ct. App. 2002), trans. denied.

Mother contends that although she "was unable to complete court ordered services established for reunification with her Children after their 2012 removal, [she] was able to accomplish the goal of the case plan by securing and maintaining sobriety," and points to evidence that she participated in the Rainbow Recovery Program; produced negative drug screens; was sober at the time of the hearing; and, while incarcerated, "voluntarily participated in substance abuse courses . . . ." Appellant's Brief at 8. She asserts that the court erred when it "failed to infer that the proactive behavior" taken by Mother, which included "taking accountability for her past . . . significantly reduced the likelihood or even

14

probability that the Children would again be removed from Mother's care." Id. at 11. DCS maintains that Mother's arguments are "simply a challenge to the weight the juvenile court afforded the evidence at the termination hearing," which amounts to an invitation "to reweigh the evidence." DCS's Brief at 24. DCS argues that Mother's prolonged use of illegal drugs, punctuated by brief periods of sobriety, along with her prior history with DCS and the fact she "did not inform DCS" about her move to Pennsylvania during her Children's CHINS case suggests that "the juvenile court did not err in concluding that Mother would not likely remedy [the conditions leading to removal]." Id. at 25-26.

Although Mother testified she was not on methadone at the hearing and had sought treatment for her addictions at Rainbow Recovery and the C.D.A. program in the Porter County Jail, we observe that Mother was ordered to participate in inpatient rehabilitation but instead chose to leave the State and pursue treatment on her own. Mother acknowledged that she did not complete the program, which was a methadone management program rather than inpatient rehabilitation, as required by court order. Of the services required under the dispositional decree, Mother participated in only the substance abuse assessment and the parenting assessment, and the court heard evidence regarding Mother's pattern of sobriety and drug relapse. Moreover, the results of Mother's parenting assessment revealed that she was "considered very high risk for child abuse and neglect." Transcript at 82. FCM Stephens added that "[d]ue to the very poor prognosis of the parenting, I would believe that parenting [education] would be essential before we could even move forward [to reunification]." Id. at 109.

Mother also has a prior history with DCS and has moved around frequently, often living with family members, and she stated that the last time she maintained housing that was her own was sometime in 2010 when she was living in New Chicago. In her testimony regarding her post-incarceration plans for housing and employment, she acknowledged that she "totally underst[ood]" why those plans would be a cause for concern. Id. at 74. Additionally, Mother also had a pending a case for trespass to address after her release from the Porter County Jail on the theft charge. To the extent that Mother presented testimony indicating she had produced a clean drug screen on November 8, 2013 and was not using methadone at the time of the hearing, we note that after January 3, 2014, Mother was incarcerated in the Porter County Jail where drugs were not available to her. Testimony at the termination hearing revealed that Mother had not fully complied with all of the services required by the dispositional decree, had not secured stable housing, income, or employment, and has a historical pattern of drug relapses.

Based upon the record, we conclude that clear and convincing evidence supported the court's determination that there was a reasonable probability that the conditions leading to the Children's removal would not be remedied. See In re K.T.K., 989 N.E.2d 1225, 1234 (Ind. 2013) (finding that where a parent with a history of substance abuse, who maintained sobriety while incarcerated "where she would have not had access to any illegal substances, nor be subjected to the type of stressors – namely the responsibility of maintaining a household and raising three young and active children" that might trigger a relapse, the trial court was within its discretion to disregard remedial efforts made by the parent shortly before a termination hearing and to give more weight to prior conduct).

B.      Best Interests and Satisfactory Plan

We next consider Mother's assertion that DCS failed to prove that termination of her parental rights was in the Children's best interests and that DCS lacked a satisfactory plan for the Children's care and treatment. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. A.D.S. v. Ind. Dep't. of Child Servs., 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), trans. denied. "[A]doption is a 'satisfactory plan' for the care and treatment of a child under the termination of parental rights statute." See In re B.M., 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009) (quoting In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)). A satisfactory plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." In re D.D., 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), trans. denied.

Mother asserts that termination is not in the Children's best interests because the "children's ages are such that permanent separation from Mother could result in irreparable harm to the children; especially if the children are not afforded the opportunity to enjoy life with a clean and sober mother." Appellant's Brief at 13. She maintains that terminating

17

the parent-child relationship does not serve the Children's best interests because adoption "among two or more foster homes" would "threaten[] the sibling relationship" and the "trial court had nothing before it that would ensure that siblings would maintain contact with one another." Id. at 14. DCS maintains that testimony at the hearing demonstrated that the traumatic experiences inflicted upon the Children because of Mother's issues, coupled with the stability the Children have experienced in their placements with foster parents, who are each willing to adopt the Children, demonstrates that termination is in the Children's best interest.

The record reveals that the Children suffer from serious issues related to Mother's lifestyle and troubles that have left them traumatized. The court heard testimony that M.B. has been "diagnosed with mood disorder, oppositional defiant disorder . . . has been placed in Michiana behavioral health, [and] was on his way to a residential facility at age seven." Transcript at 117. S.B. had "huge boundary issues, doesn't know a stranger from a person that is close to [her]." Id. Regarding C.B., family consultant Edwards explained that he has not "really been exposed to [Mother]" and "needs ongoing services to make sure that [C.B.] has developed mentally . . . ." Id. at 183. Moreover, Edwards testified that the Children "are doing so well currently, they've made [] tremendous progress" and she was "very impressed with the progress that they've made" in their placements. Id. at 181. Edwards also testified that termination was in the Children's best interest. FCM Stephens indicated that termination and adoption was in the Children's best interests. Testimony also revealed that Mother had not remedied the conditions leading to removal. The two adoptive homes are separate, as Mother points out in her brief, but the Children have

experienced greater stability in foster care and the foster parents have indicated that they are willing to adopt.

Based on the totality of the evidence, we conclude that the court's determination that termination was in the Children's best interests is supported by clear and convincing evidence. See In re J.C., 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (observing that "[r]ecommendations of the case manager . . . in addition to evidence the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests"), reh'g denied. The record also reveals that sufficient evidence supported the court's conclusion that adoption into two separate homes by the foster parents is a satisfactory plan for the care and treatment of the Children. See A.J. v. Marion Cnty. Office of Family and Children, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008) (concluding that, in light of the evidence, the plan set forth by the MCDCS in the case for the adoption of the children, albeit in different homes, was not unsatisfactory), trans. denied.

## CONCLUSION

We conclude that the trial court's judgment terminating Mother's parental rights related to her Children is supported by clear and convincing evidence. We find no error and affirm.

Affirmed.

BARNES, J., and BRADFORD, J., concur.